LESSEE OF JOHN POLLARD, WILLIAM POLLARD, JOHN FOWLER AND HARRIET HIS WIFE, HENRY P. ENSIGN AND PHEBE HIS WIFE, GEORGE HUGGINS AND LOUISA HIS WIFE, JOSEPH CASE AND ELIZA HIS WIFE, PLAINTIFF IN ERROR, *v.* JOSEPH F. FILES, DEFENDANT.

It is the settled doctrine of the judicial department of the government, that the treaty of 1819 with Spain ceded to the United States no territory west of the river Perdido. It had already been acquired under the Louisiana treaty.

In the interval between the Louisiana treaty and the time when the United

States took possession of the country west of the Perdido, the Spanish government had the right to grant permits to settle and improve by cultivation, or to authorize the erection of establishments for mechanical purposes.

These incipient concessions were not disregarded by Congress, but are recognised in the acts of 1804, 1812 and 1819; and, as claims, are within the act of 1824.

That act (of 1824) gave a title to the owners of old water-lots, in Mobile, only where an improvement was made on the east side of Water street, and made by the proprietor of the lot on the west side of that street. Such person could not claim as riparian proprietor, or where his lot had a definite limit on the east.

THIS case was brought, by writ of error under the 25th section of the Judiciary act, from the Supreme Court of the state of Alabama.

It was an ejectment, brought by the plaintiff in error, in the Circuit Court of the state of Alabama for Mobile county, to recover a lot in the city of Mobile, on the east side of Water street.

By the original plan of the town, a street was laid off, called Water street, on the margin of the river, running nearly north and south, which was afterwards filled up; and by the improvement, the water, at high tide, was confined to the eastern edge of the street.

Pollard's heirs claimed under a Spanish grant from Perez, in 1809, to Pollard the ancestor, which grant, as they alleged, was saved in the act of Congress of 1824, and expressly admitted in an act of 1836, entitled "An act for the relief of William Pollard's heirs," under which a patent issued, embracing the premises in question.

The defendant, Files, connected himself with three different branches of title:

1. That of Forbes and Company.
2. That of Curtis Lewis.
3. That of the corporation of the city of Mobile.

1. The title of Forbes and Company.

They held a grant from the Spanish government for a lot fronting upon Royal street (which is the next on the west to Water street) and running back 304 feet to the east, to a water-lot. It was alleged that the act of Congress of 1824 (cited at large in the report of the case of the City of Mobile *v.* Emanuel et al., 1 Howard, 95, vested a title in the water-lot to them as proprietors and occupants of the lot fronting on the river Mobile.

2. The title of Curtis Lewis.

It was alleged that he had made an improvement upon the water-lot, and thus brought himself within another clause of the act of 1824.

3. The title of the city of Mobile.

It was alleged that Congress, by the act of 1824, had granted to the city of Mobile " all the right and claim of the United States to all the lots not sold or confirmed to individuals, either by this or any former act, and to which no equitable title exists in favour of any individual, under this or any former act, between high water-mark and the channel of the river," &c.; and that Pollard's claim not coming within any of the exceptions, the title of the United States passed to the city of Mobile.  In this view, the United States in 1836, of course, had no title which they could transfer to Pollard's heirs.

The case was tried in the Circuit Court of the state, and the opinion of the court upon the law was in favour of the defendant, Files: it was carried by Pollard to the Supreme Court of the state, by which the judgment was affirmed, and to review this opinion the present writ of error was brought.

The facts are set forth in the bill of exceptions taken in the court below, which is as follows:

Bill of Exceptions.

Be it remembered, that in the term of the Circuit Court begun and held in and for the county of Mobile and state of Alabama, on the fifth day of May, in the year of our Lord one thousand eight hundred and forty-one, before the Honourable E. S. Dargan, judge of the tenth judicial district, came John Doe, by his attorney, George F. Sallè, and impleaded Bernard De Sylva, in whose stead the landlord, Files, was admitted to defend in a plea of trespass in ejectment, upon the demise of John Pollard, William Pollard, John Fowler and Harriet his wife, late Harriet Pollard, Henry P. Ensign and Phebe his wife, late Phebe Pollard, George Huggins and Louisa his wife, late Louisa Pollard, Joseph Case and Eliza his wife, late Eliza Pollard, for a term of years not yet expired, to a certain lot or parcel of land lying in the city of Mobile, between Church street and North Boundary street, and bounded on the north by the south side of what was formerly called John Forbes and Co.'s canal, on the south by what was called the King's wharf, on the west by Water street, and on the east by the channel of the river; and thereupon issue was joined between the said lessors of the plaintiffs and the said Files, who, at the trial, in pursuance of an act of the legislature of Alabama, passed on the eighth day of January, one thousand eight hundred and thirty-six, entitled " An act for the relief of tenants in possession against

dormant titles," suggested to the court that he and those whose estate he has in the lands or tenements sued for have had adverse possession of the same for three years next before the commencement of such suit, and have made valuable improvements on the lands, so on which suggestion issue was joined; also, on the day and year aforesaid, the said issues so joined, between the said parties as aforesaid, came to be tried by a jury for that purpose duly empannelled and sworn; at which day came there as well the said plaintiffs as the said defendant, by their respective attorneys; and the plaintiffs, in order to maintain the issue on their part, gave in evidence an act of Congress passed on the twenty-sixth day of May, one thousand eight hundred and twenty-four, entitled "An act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city." They further gave in evidence an act of Congress passed July 2, 1836, entitled "An act for the relief of Wm. Pollard's heirs." They further gave in evidence a patent issued on the fourteenth day of March, one thousand eight hundred and thirty-seven, in pursuance of said act of Congress of July 2, 1836, which patent embraced the premises in question. They further gave in evidence a Spanish grant, of which the following is a translation:

Mr. COMMANDANT:—William Pollard, an inhabitant of this district, before you, with all respect represents: that he has a mill established upon his plantation, and that he often comes to this place with planks and property from it, and that he wishes to have a place propitious or suitable for the landing and safety thereof, and that, having found a vacant piece at the river side, between the canal which is called John Forbes and Co.'s and the wharf at this place, he petitions you to grant him said lot on the river bank, to give more facility to his trading; a favour he hopes to obtain of you.

Mobile, 11th December, 1809.     WILLIAM POLLARD.

*Mobile, 12th December,* 1809.

I grant the petition; the lot or piece of ground he prays for, on the river bank, provided it be vacant.     CAYETANO PEREZ.

The plaintiff then proved the genuineness of the signature of Cayetano Perez, and referred to the state papers relating to the public lands to show the different periods during which Perez was in command.

The plaintiff then gave in evidence that the premises sued for

were situated between Church street and North Boundary street and immediately in front of lots known under the Spanish government as water-lots, and that the said lot now sued for was, in the year one thousand eight hundred and twenty-four, and is now, known as a water-lot; that it lies on the east side of Water street; that what is now Water street was, under the Spanish government, and at the date of the grant to Forbes and Co., hereafter attached, a natural ridge, and that the ordinary tides did not overflow said ridge, and very high tides entirely covered said ridge; that to the north of the lots lying immediately west of the lot sued for, near Conti street, there was a depression in said ridge, where the water, at high tide, flowed around upon the eastern part of the lots lying, as before stated, immediately west of the lot sued for, and which were known as water-lots under the Spanish government.

The plaintiffs then gave in evidence that John Forbes and Co. applied for and obtained permission, from the Spanish government, to open or cut the canal which was called John Forbes and Co.'s canal, after they had obtained a grant for the lot lying immediately west of said canal.

The defendant, in order to maintain the issue on his part, gave in evidence a Spanish grant to John Forbes and Company, for a lot of ground eighty feet front on Royal street, with a depth of three hundred and four feet to the east, which is hereto attached and marked A, together with the plat or survey thereto attached, which is made part of this bill of exceptions; and proved that the said lot was situated immediately west of the lot sued for, and was separated from it now only by Water street; but that Water street was not known at the date of this grant, and that said street was laid off in 1820 and 1821. The defendant further gave in evidence a certificate of confirmation for the said lot to John Forbes and Company, who were the successors of Panton, Leslie and Company, the original grantees; which is also made a part of this bill of exceptions, and marked B, by which it will appear that 304 feet were confirmed to Forbes and Company.

The defendant also proved that one Curtis Lewis, some time in 1822 or 1823, sunk some flat boats in the canal called Forbes and Company's, and proceeded to fill up the lots now sued for, but that one James Inerarily, one of the firm of Forbes and Company, dispossessed him in the night, and erected a smith's-shop, and continued in possession about nine months, when Curtis Lewis regained possession by writ of forcible entry and detainer.

It further appeared in evidence that the ridge in Water street was about fifteen or twenty feet in width, and that it was covered by the ordinary tides for about one-third of its width, up to the year 1822, and that all the land east of Water street, as at present laid out, up to 1813, was below the ordinary high water-mark. It further appeared that the firm of Forbes and Company enᴛᵤₑed upon the lot granted to them as aforesaid, and made valuable improvements on it, and fulfilled the conditions of the grant, and on the 25th May, 1824, held the land to the west of Water street without dispute.

It further appeared that the first improvements on the lot east of Water street were made by Curtis Lewis, except the canal, and improvements along it, of John Forbes and Company; but it was also in evidence that, in 1811, a witness had seen the servants of Wm. Pollard removing some drift wood and piling some lumber on the lot in question.

The nature and extent of Curtis Lewis's improvements are before stated. The reports of commissioner Crawford, upon the titles before referred to, were read from 3d volume of the State Papers, and they are understood to form a part of this bill of exceptions.

E. S. DARGAN, [L. S.]

The defendant then connected himself with the title of Curtis Lewis, Forbes and Company, and the corporation of the city of Mobile, which claimed the same by virtue of the act of 1824 above referred to.

In the progress of the trial, when the plaintiffs offered in evidence the Spanish grant to Pollard, the defendant's counsel offered evidence, the object of which was to prove that the date of the grant had been altered; the plaintiffs objected to the introduction of the evidence for that object, but was overruled by the court, to which he excepted. The defendant then passed the grant to the witnesses, who, upon an inspection of the same, were of opinion that the figures 09, in the date of 1809, on the face of the grant, had been altered.

The plaintiff then offered witnesses who proved, that having inspected it with a spy-glass, the alteration was from 1810 to 1809. Plaintiffs also proved that Cayetano Perez was commandant at Mobile in 1810.

The defendant further gave in evidence that he had made valuable improvements on the lot sued for since the 8th day of January, 1836, to the value of $7000; whereupon the plaintiffs, by their counsel, prayed the court to charge the jury, First, that the said Spanish grant made to William Pollard was ratified and confirmed by the 8th article

Pollard's Lessee *v.* Files.

of the treaty of amity, settlements and limits, between the United States and his Catholic Majesty, dated 22d February, 1819; which charge the court refused to give; to which the plaintiffs, by their counsel, excepted.

The plaintiffs then, by their counsel, prayed the court to charge the jury that the act of Congress of 26th May, 1836, confirmed the said Spanish grant to Pollard; which charge the court refused to give, but on the contrary, charged the jury, if they believed the evidence to be true, the fee-simple to the premises sued for were vested in Forbes and Company, and that the acts of Congress of 1824 and 1836, and the patent in pursuance thereof, were utterly void, so far as relates to the premises in question, and that no title vested in the lessors of plaintiff by virtue of said acts of Congress and said patent; to which charge the plaintiffs excepted.

The plaintiffs, by their counsel, then prayed the court to charge the jury, that if they should find that an alteration had been made in the date of Pollard's Spanish grant, advantage could not be taken of it in an action of ejectment, but by a *sci. fa.* in the name of the general government, or a bill in equity; which charge the court refused to give, but, on the contrary, charged, that if they should believe that the date, had been altered, that they should find for the defendant, unless they were satisfied from the evidence that, though altered, it was made in fact whilst Perez was commandant; that the alteration of the date would not affect the grant if Perez was commandant at the time of the execution; but that if altered, the law would not presume that the grant was made while Cayetano Perez was commandant, but that this must be shown by the evidence; to which charge, so given, and the refusal to charge as prayed, the plaintiffs excepted.

The plaintiffs then prayed the court to charge the jury, that the act of January 8th, 1836, passed by the legislature of Alabama, entitled "An act for the relief of tenants in possession, against dormant titles," is contrary to the tenth section of the first article of the Constitution of the United States, and is therefore void; which charge the court refused to give, but, on the contrary, charged that it is constitutional; to all which the plaintiff excepted, and prayed the court to sign and seal this his bill of exceptions, which is done.

E. S. DARGAN, Judge. [L. S.]

It has been before stated, that this opinion of the court was affirmed by the Supreme Court of the state of Alabama. The following extract from the opinion of the latter court, is given, in order that the remarks

made by the Supreme Court of the United States may be fully understood.

"If the law, as laid down by a majority of the court, in the lessee of Pollard's heirs v. Kibbe, 14 Peters, 353, is to be regarded as decisive of the law applicable to the plaintiff's title, and as excluding all objection to it, then the answer given by the Circuit Court to the second charge prayed is confessedly erroneous. Of the authority of that case we have nothing to say. We may, however, be permitted to remark, with all deference, that we should yield to it more willingly, if it had the sanction of a majority of the Supreme Court. We are aware that, as reported, the judgment seems to have been concurred in by five of the justices; but we have in our possession a manuscript copy of the opinions of Justice Thompson, McLean, Barbour, and Catron, and the judgment that was rendered; at the foot of which is the following memorandum: 'Dissenting justices, Catron, Barbour, and Wayne. Mr. Chief Justice Taney did not sit in this case.' Attested as follows, 'True copy, test. Wm. Thos. Carroll, C. S. C., U. S.' That Mr. Justice McKinley was absent during the entire term, appears from a note of the reporter. If the attestation of the clerk be correct, then but four of the justices concurred in reversing the judgment of this court. And to all this, it may be added, that Mr. Justice McLean did not agree to the judgment of reversal, so far as we are informed by his opinion, upon the ground that the grant to William Pollard in 1809 was a 'new grant' within the meaning of the act of the 26th of May, 1824. But he yielded his assent to the conclusion of Mr. Justice Thompson, (as we understand it,) because the second section of that statute required the improvement to be made on the lot east of Water street, and to entitle the proprietor of the lot, immediately west of the water-lot, the improvement should have been made by himself. These were questions, which, it seemed to us, were wholly unimportant to be considered, unless Pollard's was a 'new grant,' since it is an undisputed principle, that the plaintiff must recover upon the strength of his own title, and not upon the weakness of his adversaries.

"We have taken this view of the case referred to, with the most profound respect for the Supreme Court of the United States, and have only to say, that we hope an opportunity may soon be afforded for a re-examination of the act of 1824."

*Coxe*, for the plaintiff in error.

*Sergeant*, for the defendant.

*Coxe* contended,

1. That the judgment below was erroneous, and ought not to be reversed.

2. That the Circuit Court erred in refusing to give the instructions as prayed by the plaintiff.

3. That it erred in giving the instructions which were given to the jury.

He considered the principle of the present case as decided in Pollard's heirs *v.* Kibbie, 14 Peters, 353. The same grant was there brought under review; and it was decided that the act of 1836 was a private act which Congress had power to pass; that the claim of Pollard was excepted in the 2d section of the act of 1824, and that the term "new" applied to grants made after the cession of Louisiana. Pages 360, 362, 364.

He referred also to 16 Peters, 234, where the question came up again, and quoted passages from pages 247, 251, 257, 265, 422, 427; from all which he inferred that the question had been decided and the rights under it settled.

*Sergeant,* for the defendant in error, said he did not mean to question any point decided in 14 Peters, but argued,

I. The plaintiff below had no right.

1. He derived no right from the act of 1824, because he was not within the act; and, also, because the United States had nothing in the premises to grant.

2. He derived no right from the act of 1836, and the patent under it, as well for the reasons already stated, as because the right of the United States, if any they had, was already granted by the act of 1824 to those under whom the defendant claims.

II. The court did not err in refusing to give the instructions asked for by the plaintiffs, nor in giving the instructions which they did give.

III. The court did not err in refusing to instruct the jury that the act of 8th January, 1836, is contrary to the Constitution of the United States; and, if they did, it is immaterial, as the plaintiff were barred on other grounds.

This is a different case from Kibbie's, and not covered by that decision. There was an error in fact there which misled the court, and which was not discovered until this case was tried. The claim is to a place between high and low water-marks, and the grant called for fast land. The grant was not surveyed or recorded.

1. The plaintiff derived no right from the act of 1824, because he was not within it. He cannot bring himself within any of the exceptions. He never owned a water-lot, nor made any improvements. 7 Laws United States, 318, act of 26th May, 1824.

If it be said that the plaintiff claims under a new and valid grant, the answer is, that if there was any grant at all, it was issued when Spain had no power to make one. In Pollard's lessee *v.* Kibbie, the paper was said to have been executed on December 12, 1809, and the court took this for granted. It was the foundation of the opinion. 14 Peters, 351. But this record shows that the date was altered, and that 1809 was not the true one. The jury found the fact of the alteration from 1810 to 1809, and if issued in 1810, Perez had no authority to make the grant.

The alteration must be presumed to be made after execution. Peters C. C. R. 369. And the materiality of the alteration is a question for the court. 1 Peters, 552.

Perez, in 1810, having no power to grant, the basis of the plaintiff's title is gone, and the case infected with fraud.

The act of 1824, says the " Spanish government must have made a new grant or order of survey for the same, during the time at which they had the power to grant the same;" and although the judges differed as to the precise time when Spanish authority ceased, all agreed that it was extinct on the 12th December, 1810. Opinion of Judge Baldwin, page 368, 369, 370; of Judge McLean, 366; of Judge Catron and Barbour, 426, 428; Thompson, 355.

The proclamation of the President was in October, 1810. The point decided in Kibbie's case was that the grant was issued when the Spanish government had a right to do it, and the case stood upon that. At page 361, Judge Thompson says the grant was dated 12th December, 1809, and was rejected by the commissioner because there were no improvements on the lot.

But possession is required to create a title. 1 Howard, 95.

2. The plaintiff derived no right from the act of 1836, or the patent under it. That act is only a quit claim on the part of the United States, but they had nothing to grant. All their title had previously been granted to Forbes and Company, or to the city of Mobile, and the defendant unites those titles. The grant to Forbes and Company ran to the water; they had fulfilled all the conditions, had entered and made improvements before the act of 1824 passed. There was no Water street; nothing to divide them from the river.

The act of 1824 vested a title *per se*, and the parties had nothing to do but go into court and show the facts in evidence. If the act of 1836 be considered as explanatory of that of 1824, it is dangerous to construe a general act by a private one, obtained by a party for his own benefit. The true construction of that of 1824 is that the improvement must be made on the old lot; that every one who went to the water should not be cut off from it. It supposes an inchoate right to the lot in front, because an exception is, if a party has alienated the lot in front. He must, therefore, have had a right to alienate.

In Esclava's case, the record showed that the party who owned the old lot had improved both the old and new. The question, therefore, did not come up.

[The arguments of both counsel as to the right of the state of Alabama over navigable water in virtue of her sovereignty, are omitted, because the opinion of the court does not touch upon that point.]

*Coxe*, in reply.

It is said that the improvement must be upon the old lot, but, in 14 Peters, three of the judges dissented on this ground, and in 16 Peters, the court confirmed the dissent, and said it must be on the new lot. 16 Peters, 247.

It has been said that Forbes and Company were riparian proprietors, running down to the water. But their grant calls only for a certain number of feet; and it was confirmed by the commissioner just in that way.

It has also been said, that the grant of 1809 was void. But the plaintiff has a patent under the act of 1836. If the plaintiff had recovered below, and the defendant had excepted to instructions, the question about the grant would have come up. The President's proclamation was in 1810, but no act of Congress was passed until 1811, and the country was not taken possession of until after that act. The record shows that evidence was given on the trial that Perez was commandant in 1810.

The volume of State Papers referred to, shows that Perez issued a grant in May, 1811, and even as late as November, 1811. Vol. 3, Public Lands, 450, 454.

Mr. Justice CATRON delivered the opinion of the court.

For the facts of the case, we refer to the report of it. It presents

the same titles, and, substantially, the same facts, that were before this court in Pollard's heirs v. Kibbie, 14 Peters, 353.

The first instruction asked by the plaintiff of the state Circuit Court is, that the Spanish grant made to William Pollard was ratified and confirmed by the eighth article of the treaty with Spain of 1819, by which the Florida's were acquired. This the court refused to give; and correctly.

It is the settled doctrine of the judicial department of this government, that the treaty of 1819 ceded no territory west of the river Perdido, but only that east of it: and therefore all grants made by Spain after the United States acquired the country from France, in 1803, are void, if the lands granted lay west of that river; because made on territory acquired by the treaty of 1803; which extended to the Perdido east. It was thus held in Foster and Elam v. Neilson, 2 Peters, 254, and again in Garcia v. Lee, 12 Peters, 515, and is not now open to controversy in this court.

2. The plaintiffs then, by their counsel, prayed the court to charge the jury that the act of Congress of 26th May, 1836, confirmed the said Spanish grant to Pollard; which charge the court refused to give, but, on the contrary, charged the jury, if they believed the evidence to be true, the fee-simple to the premises sued for were vested in Forbes and Co., and that the act of Congress of 1824, and 1836, and the patent in pursuance thereof, were utterly void, so far as relates to the premises in question, and that no title vested in the lessors of plaintiff by virtue of said acts of Congress and said patent; to which charge the plaintiffs excepted.

The questions raised by the instruction asked and refused; and that given, will be examined so far only as to decide the present case.

This court held, when Pollard's title was before it, formerly, that Congress had the power to grant the land to him by the act of 1836: on this point there was no difference of opinion at that time among the judges. The difference to which the Supreme Court of Alabama, in the present case refers, (in its opinion in the record,) grew out of the construction given by a majority of the court to the act of 1824, by which the vacant lands east of Water street, were granted to the city of Mobile. That grant excepted out of it, all lots to which, "the Spanish government had made a new grant, or order of survey for the same, during the time at which they had the power to grant the same." If Pollard's was such "a new grant," then the land

covered by it was.excepted and did not pass to the city; and the act of 1836, and the patent founded on it, passed the title to Pollard.

After the country west of the Perdido had been acquired by the treaty of 1803, the Spanish government continued to exercise juris-diction over the country, including the city of Mobile, for some nine years; the United States not seeing proper to take possession, and Spain refusing to surrender it, on the assumption that the country had not been ceded by that kingdom to France in the treaty of 1800; and of course that it did not pass to this country by our treaty with France. That Spain had no power to grant the soil, during the time she thus wrongfully held the possession, is settled by the cases cited of Foster and Elam v. Neilson; and Garcia v. Lee. But the right necessarily incident to the exercise of jurisdiction over the country and people rendered it proper that permits to settle and improve, by cultivation; or to authorize the erection of establish-ments for mechanical purposes, should be granted. And to this end the concession to Pollard, of December, 1809, was made. He set forth in his petition to the commandant, that he had a mill established on his plantation, and often came to Mobile with planks and property from it; and that he wished a place propitious and suitable for the landing and safety thereof; and having found a vacant piece at the river side, between the canal of Forbes and Co. and the public wharf, he solicits the commandant to grant him said lot on the river bank, to give more facility to his trading. This lot, the governor granted to. Pollard for the purpose set forth by him.

The use, for the purpose solicited, during the time the Spanish authorities were exercised, could be properly granted: of this there can be no doubt.

Very many permits to settle on the public domain and cultivate, were also granted about the same time; which were in form incipient concessions of the land, and intended by the governor to give title, and to receive confirmation afterwards from the king's deputy, so as to perfect them into a complete title. Pollard's was also of this description. Although the United States disavowed that any right to the soil, passed by such concessions; still they were not disre-garded as giving no equity to the claimant: on the contrary, the first act of Congress passed (of April 25, 1812) after we got possession of the country, appointed a commissioner to report to Congress on them in common with all others originating before the treaty of 1803 took effect. The third section orders all persons, claiming lands, in

the previously disputed territory "by virtue of any grant, order of survey, or other evidence of claim, whatsoever derived from the French, British, or Spanish governments, to be laid before the commissioner, with a notice in writing, stating the nature, &c., of the claim." On these, (by sec. 5,) the commissioner had power given him to inquire into the justice, and validity of the claims; and in every case it was his duty to ascertain whether the lands claimed had been inhabited and cultivated; at what time the inhabitation and cultivation commenced; when surveyed and by whom; and by what authority—and into every matter affecting their justice and validity.

By sec. 6, abstracts were to be furnished to the secretary of the treasury, of the claims, arranged in classes, according to their respective merits; and these abstracts, &c., were to be laid before Congress, for their determination thereon, &c.

By sec. 8, the commissioner was ordered to report to Congress at its next session, a list of all actual settlers on the land in his district, who had no claims derived from either the French, British, or Spanish governments, and the time such settlements were made.

In January, 1816, the report of commissioner (Crawford) was laid before Congress. 3 Am. State Papers, 6, "Public Lands."

The 14th sec. of the act of March 26th, 1804, declares all grants void if made for lands within the territories ceded by the French republic to the United States, by the treaty of the 13th of April, 1803, (and which had been acquired by France from Spain,) that had been made after the date above. Provided, that the law should not be construed to make void any *bona fide* grant made by the Spanish government, to an actual settler on the lands granted, for himself, and for his wife and family, &c. On Pollard's claim the commissioner reported unfavourably, because it had "not been inhabited nor cultivated." 3 State Papers, 18. The bill of exceptions refers to this report as it stands in the book, as part of the bill of exceptions, and as such it is treated by us.

In April, 1818, by a resolution of the senate, it was referred to the secretary of the treasury to furnish a plan, for an adjustment of the claims reported on by the commissioners east and west of Pearl river: and on the 7th of December, 1818, the secretary made his report in the form of a bill. 3 State Papers, 391. On all the imperfect claims favourably reported on, by the commissioners, derived

from the authorities of Spain before the 20th of December, 1803, a confirmation was recommended:   And the land that had been cultivated on or before that day, should be confirmed also, as if the titles had been completed.   And as to all the other claims favourably recommended to Congress by the commissioners, the claimant should be entitled to a grant therefor, as a donation—not to exceed to any one person more than six hundred and forty acres:  That all settlers before the 15th of April, 1813, shall receive a grant for the land claimed, not exceeding six hundred and forty acres, if actually inhabited and cultivated.

On this report the act of March 3d, 1819, was founded—and by sec. 2, each settler with title-papers, had confirmed to him his habitation as a donation, not to exceed one thousand two hundred and eighty acres; and this irrespective of the time when the settlement was made, if previous to the 15th of April, 1813; but the grant not to exceed six hundred and forty acres to such settlers as had presented no written evidences of title.

By the 7th, 8th, and 9th sections, those who had filed their notices of claim before the commissioner, and which had not been recommended for confirmation, were allowed to the 1st of July, 1820, to file additional evidence in support of the claim with the register and receiver, of the land-offices respectively established by that act, in the country divided by Pearl river; who had the same powers conferred on them that the commissioner previously had.   New claims might also be filed.   On these the register and receiver were to report; of course, after the 20th of July, 1820.   The land-office for the country including Mobile was at Jackson court-house.   Thus the matter stood for eight years.

By the act of March 3d, 1827, further time was given to the first of September, 1827, to claimants whose evidences of claim had been previously filed with the commissioner, to produce further evidence and " to present their titles and claims, and the evidence in support of the same, to the register and receiver of the land-office at St. Stevens."   By sec. 2, they were ordered to hold their sessions at the city of Mobile, and there examine the suspended claims on the same principles the commissioner had done.

Thus suspended and protected, stood the title of Pollard when the act of 1824 was passed granting to the city of Mobile the river front.   And from any thing appearing to the contrary, it stood equally

3 E 2

protected until confirmed by the act of 1836.. It was for the sove-
reign power to judge of its merits; it had never been rejected, and
was awaiting the final action of Congress. Furthermore; it was
from its situation as a city lot not subject to entry in a land-office,
being in no survey of the public lands: and it is a fair construction
of the exception to the act of 1824, to hold Pollard's claim was in-
tended to be within the following exception; as well as the one
commented on in Pollard v. Kibbie: That is—"Provided, that no-
thing in this act contained shall be construed to affect the claim or
claims, if any such there be, of any individual, or of any body politic
or corporate."

We think Pollard's was a claim of an individual within the ex-
ception, and was so deemed by Congress; as the United States, by
the first section, only profess to grant their right to the city front:
and except all lots confirmed by Congress by that, or any previous
act—and also such "to which an equitable title existed in favour of
any individual under this, or any former act." Then in the second
section, the provision examined in the case of Pollard v. Kibbie has
direct reference to protection by excepting lots—"to which the
Spanish government had made a new grant or order of survey," &c.
It is obvious the previous obscurity and confusion were intended to
be explained by the proviso: simply expressed, that nothing which
preceded should affect any individual claim—regardless of the fact
whether it was good or bad, so it was a recognised claim by the
United States. That Pollard's was so, is most apparent by the pro-
tection afforded to it: and such is the unanimous opinion of this
court, for the reasons formerly and now given, taken together.

Pollard's patent is therefore valid, unless the second instruction
given be true—that the act of Congress of 1836, and the patent
founded on it be void, as relates to the subject in controversy; and
therefore the lessors of the plaintiff derived no title from these sources,
because the fee-simple of the premises was in John Forbes and Co.,.
when Pollard took his title.

It was held in the City of Mobile v. Elava, 16 Peters, 247, that
the improvements referred to in the act of 1824, by virtue of which
a title was given to the owner of the old water-lot west of Water
street, to the lot immediately east of it, must have been made on the
new, and eastern water-lot: second, that such improvement must
have been made by the proprietor of the old lot.

Forbes and Co. had none such, and therefore took no benefit under the act of 1824.

If the instruction intended to maintain that Forbes and Co., as riparian proprietors of the lot west of Water street, could claim all the land east of it, to the channel of the river, then we think the court erred : and we take it for granted the court so intended ; as by no other means could the land sued for be claimed by Forbes and Co. from any evidence in the record. Their lot was a grant of 1802, for 80 feet front, by 304 feet deep, west of what is now Water street; and bounded on the east by the street as it now exists. High tide formerly reached it ; low tide did not : But we deem this an immaterial circumstance. Forbes and Co.'s grant was a specific town lot bounded by streets, then existing or expected to exist; it fronted to the east on a contemplated street, reserved to the public use, as ungranted property ; and it never was contemplated by the grant to give any right to the soil beyond its fixed boundary east, as actually surveyed. It does conform, and must conform, to the city arrangement of lots : if it was held otherwise, then every other proprietor of an old front lot could claim over the mud-flat to the channel of the river, as a riparian owner; sweeping through the city property as it now exists by filling up, and raising the flat, to the extent east of probably a thousand feet, or more. We deem such an assumption entirely inadmissible : and therefore think the court also erred in the second instruction given, as well as in refusing that asked on part of the plaintiffs.

With the third instruction this court cannot interfere : and the jury having found for the defendant, no question arises on the fourth instruction.

For the reasons assigned, we order the judgment of the Supreme Court of Alabama to be reversed.

### ORDER.

This cause came on to be heard on the transcript of the record from the Supreme Court of the state of Alabama, and was argued by counsel. On consideration whereof, It is now here ordered and adjudged by this court that the judgment of the said Supreme Court of the state of Alabama be, and the same is hereby reversed with costs; and that this cause be, and the same is hereby remanded to the said Supreme Court, that further proceedings may be had therein, in conformity to the opinion of this court, and as to law and justice shall appertain.