Mr. Justice CATRON
dissented.
The statute of 1836,-.and1 the patent of -the United States founded on it, by which the land in controversy was granted to Wm. Pol-, lard’s heirs, have on several occasions heretofere received the sanction of this-court as. a valid title.-
1. In the cause bf Pollard’s heirs v. Kibbe, 14 Peters, 353, the *231 Supreme Court of Alabama having pronounced. an opposing claim under the act of 1824 superior to-Pollard’s, this court reversed the judgment and established the latter, after the most mature consideration. •
2; In the case of Pollard v. Files, 2 How. 591, the precise title was again brought before this court, and very maturely considered; it was then said — (page 602) — “ This court held, when Pollard’s title was before it formerly, thaCCongress had the power to grant the land to him by the act of 1836: on this point there was no difference of opinion at that time among the judges. The difference to which the Supreme Court of Alabama refers, (in its opinion in the record,) grew out-of the construction given by a majority of the court to the act of 18.24, by, which the vacant lands east of Water street were granted to the city of Mobile.”
On this occasion the decision of the Supreme Court of Alabama was again reversed, and Pollard’s heirs ordered to be put into possession and they now maintain it under our two judgments. It is here for the third time.
In the mean time, between 1840 and 1844, a doctrine had sprung up in tire courts of Alabama, (previously unheard of in any court of justice in. this country, so far ás I know,) assuming that all lands temporarily flowed with tide-water were part of the eminent domain and a sovereign right in the old states; and that the new ones when admitted mto the union, coming in with equal sovereign rights, took the lands thus flowed by implication as an incident of state sovereignty, and thereby defeated the title of the United States, acquired either, by the treaty of 1803, or by the compacts with Virginia or Georgia. Although the assumption was new.in the courts, it was not entirely so in the political discussions of the country; there it had been asserted, that the new states coming in, with equal rights appertaining to the old ones, took the high lands as well as the low, by the same implication now successfully asserted here in regard to the low lands; and indeed it is difficult to see where the distinction lies. That the United States acquired in a corporate -capacity the right of soil under water, as well as of the high lands, by the treaty with France, cannot be doubted; nor that the right of soil was retained and. subject to grant up to the time Alabama was admitted as a state. Louisiana was admitted in 1812; to her the same rules must apply that do to Alabama. All acquainted with the surface of the latter know that many of the most productive lands there, and now in successful cultivation, were .in 1812 subject to overflow, and have since been reclaimed by levees.
It is impossible to deal with the question, before us understand- , ingly, without reference to the physical geography of the delta of the Mississippi and the country around the gulf of Mexico, where the most valuable lands have been made and are now forming by alluvion deposits of the floating soils brought down, by the great rivers; the *232 earlier 'of which had become, dry lands; but the more recent were flowed, when we acquired the country; and aré in great part yet so: thus situated they have been'purchased from the United States and reclaimed; a process that is now in daily exercise. An assumption that mud-flats and swamps once flowed, but long since reclaimed, had passed to the new. states, on the theory, of sovereign rights, did, at the first, strike my mind as a startling novelty; nor have I been enabled to relieve myself from the,.impression, owing to the fact in some degree, it is admitted, that for thirty years neither Congress, or any state legislature, has called in question the .power of the United States to grant the flowed lands, more than others:, the origin of title, and its continuance, as to either, class, being deemed the same. A right so obscure, and which has lain dormant, and even unsuspected,' for so many years, and the assertion of which will strip so much city property, and so many estates of all title, should as I think be concluded by long acquiescence, and especially in courts of justice.
Again: the question before us is made to turn by a majority of my brethren exclusively on political jurisdiction •; the right of property is a mere incident. In such a case, where there is doubt, and a conflict suggested, the political departments, state and federal, should settle the matter-by legislation: by this means private owmers could be provided for and confusion avoided; but no-state complains,- nor has any one ever'complained, of the infraction of her political and sovereign rights by the United States, or by their agents, in the execution of the'great trust imposed on the latter to dispose of the public domain for the common benefit ;• on the contrary, we are called on by a mere trespasser in the midst'of a city, to assert and -maintain this sovereign right for his individual protection, in sanction' of the trespass.
Rut as already stated, the United States may be an owner of.property in a state, as well as another state, or á priváte -corporation, or an individual may: That the proprietory interest is large, cannot alter the principle. I admit if the agents of the United States ob-' struct navigation, the state authorities may remove the obstructions and punish the offenders; so the states have done for many yeárs without inconvenience, or complaint.
Nor. can material inconvenience result. If a front to a city, or land for another purpose is needed, Congress can be applied to for a grant as was done by the corporation-of Mobile in 1824: If the state where the land lies was the owner the same course would have to be pursued. The states and the United States are not in hostility; the people of the one are’ also the people of the other; justice and ■ donation is alike due from each.
Connecticut was once a large proprietor in the North-West Territory, (now Ohio.) She owned the shores of a great lake and the banks of navigable rivers: Can it be assumed that the admission of *233 Ohio defeated the title of Connecticut, and that she could not grant ? The question will not bear discussion — ánd hów can the case put be' distinguished from the one before us: Nay, how can either be distinguished from the rights, of private owners of lands above water, or under the water? Yet in either instance,'is the owner in fee deprived of his property, on this assumption of sovereign rights.
■ The front of tire city of Mobile is claimed by. the act of 1824, sanctioned by this court as a valid grant in the fivé cases of Pollard v. Kibbe, 14 Peters; of The City of Mobile v. Eslava, 16 Peters, 234; of the same plaintiff v. Hallet, 16 Peters, 261 ; of the same plaintiff v. Emanuel, 1 How. 95, and of Pollard v. Files, 2 How. 591. Except the grant to Pollard, the act of 1824 confers the entire title, (so far as is knowm to this court,) of a most .valuable portion, and a very large portion, of the second city on the gulf of Mexico, in wealth and population. This act is declared void in the-present cause; and the previous decisions of this court are either directly, or in effect, overthrown, and the private • owners stripped of all title. On this latter point my brethern .and I fully agree: Can-Alabama, remedy the evil, and confirm the titles by legislation or by patent ? I say by patent, because this state, Louisiana, Mississippi, and surely Florida, will of necessity have to adopt some system of giving title if it is possible to do so, asidt. from private legislation; -as the flowed lands are too extensive and valuable for the latter mode of grant in all instances.
The charge of the state court to the jury was, that the act of Congress of 1836, and the patent ■ founded on it, and also, of course, the act of 1824* were void, if the lands granted by them were flowed at high tide when Alabama was admitted; and it was immaterial whether the mud-flat had been filled up and the water excluded by the labour of man or by natural alluvion.- • And this charge is declared to have been proper, by a majority of this court.
The decision founds itself on the right of navigation, and of police connected with navigation. As ¿-practical truth, the mud-flats and other alluvion lands in the’ delta of the river Mississippi, and around the Gulf of Mexico, formed of rich deposits, have no connection with navigation, but obstruct it, and must be reclaimed for its furtherance. This is well illustrated by the recent history of Mobile. When the act of 1824 was passed, granting to the corporation the front of the city, it was excluded from the. navigable channel of the river-by a mud-flat, slightly covered with water at high tide, of perhaps á thousand feet wide. This had to be filled up before" the city could prosper, and of course by individual enterprise, as the vacant space, as was apparent, must become city property; and it is now formed into squares and streets, having wharves and warehouses. The squares are built up; .and the fact that that part of the city stands on land once subject to the flow of tide, will soon be matter of history. At New Orleans, and at most other front *234 ing rivers where the tide ebbs and flows, as well as on the ocean and great lakes, navigation is facilitated by similar means; without 'their employment few city fronts could be formed, at all accommodated to navigation and trade. To this end private ownership is indispensable and universal;, and some one must make title. If the United States have.no power to do so, who has? I repeat, can Alabama grant the soil ? She disavowed all claim and title to and in it, as a condition on which Congress admitted her into the union., By the act of March 2, 1819, (3 Story’s Laws, 1726,) the Alabama territory was authorized to call a convention, and form a state constitution; but Congress imposed various restrictions, and among others the following one: “And provided always, that the said convention shall provide by an ordinance, irrevocable without the consent of the United States, that the people inhabiting, said territory do agree and declare that they for ever disclaim all right and title to the waste .or unappropriated lands lying within the said territory, and that the same shall be and remain at the sole and entire disposition of the United States.”
On the 2d of August, 1819, the convention of Alabama formed a constitution, and adopted an ordinance declaring “ that this convention, for and on behalf of the people inhabiting this state, do ordain, agree, and declare, that they for ever disclaim all right and title to the waste or unappropriated lands lying within this state; and that the same shall be and remain at the sole and entire disposition of the United States.” In addition, all the propositions offered by the act of March 2, 1819, were generally accepted without reservation.
On the 14th of December, 1819, Congress, by resolution, admitted Alabama as a state, on the conditions above set forth. 3 Story’s Laws U. S. 1804.
That the lands in contest, and granted by the acts of 1824 and 1836, were of the description of “waste or unappropriated,” and subject to the disposition of the United States, when the act of Congress of the 2d of March, 1819, was passed, is not open to controversy, as already stated; nor has it ever been'controverted, that whilst the territorial government existed, any restrictions to give private titles were imposed on the federal government; and this in regard to any lands that could be granted. And I had supposed that this right was clearly reserved by the recited compacts, as well as on ■the general principle that the United'States did not part with the right of soil by. enabling a state to assume political jurisdiction. That the disclaimer of Alabama, to all right and title in the waste lands, or in the unappropriated lands, lying within the state, excludes her from any interest in the soil, is too manifest for debate, aside from all inference founded on general principles. It follows, if the United States cannot giant these lands, neither can-Alabama,; and no individual title to them can ever exist. And to this conclusion, as I understand the reasoning, of the principal opinion, the doc *235 trine of a majority of my brethren mainly tends. The assumption is, that flowed lands, including mud-flats, extending to navigable waters, are part of such waters, and clothed with a sovereign political right in the state; not as property, but as a sovereign incident to navigation, which belongs to the political jurisdiction; and being part of state sovereignty, the United’ States could not withhold it from Alabama. On this theory, the grants of the United States are declared void: conceding to the theory all the plenitude it can claim, still Alabama has only political jurisdiction over the thing; and it must be admitted that jurisdiction cannot be the subject of a private grant.
The present question was first brought directly before this court, (as I then supposed, and nowr do,) in the cause of The City of Mobile v. Eslava, in 1840, when my opinion was expressed on it at some length. It will be found in 16 Peters, 247, and was in answer to the opinion of the Supreme Court of Alabama, sent up as part of the record; having been filed pursuant to the statute of that state, found in Clay’s Digest, 286, sec. 6. My opinion, then given, has been carefully examined, and so far as it goes, is deemed correct, (except some errors of the press,) nor will the reasons given be repeated.
In Hallet’s case, 16 Peters, 263, reasons were added to the former opinion. And again, in the case of Emanuel, the question is referred to, in an opinion found in 1 How. 101.
In Pollard’s Lessee v. Files, 2 How. 602, the question, whether Congress had power to grant the land now in controversy, was treated as settled. As the judgment was exclusively founded on the act of 1836, (the plaintiff having adduced no other title,) it was impossible to reverse the judgment of the Supreme Court of Alabama on any other assumption than that the act of Congress conferred a valid title.. I delivered that opinion, and it is due to myself to say, that it was the unanimous judgment of the members of the court then present.
I have expressed these views in addition to those formerly given, because this is deemed the most important controversy ever brought before this court, either as if respects the amount of property involved, or the principles on which the present judgment proceeds— principles, in my judgment, as applicable to the high lands of the United States as to the low lands and shores.