MANUEL GARCIA, PLAINTIFF IN ERROR v. SAMUEL LEE.

The decision of the Court in the case of Foster and Elam v. Neilson, 2 Peters, 254; by which grants made by the crown of Spain, after the treaty of St. Ildefonso, of lands west of the river Perdido, and which were by the United States declared to be within the territory of Louisiana ceded by France to the United States, were declared void; affirmed.

Congress, in order to guard against imposition, declared, by the law of 1804, that all grants of land made by the Spanish authorities, in the territory west of the Perdido, after the date of the treaty of St. Ildefonso should be null and void; excepting those to actual settlers acquired before December 20th, 1803.

The controversy in relation to the country lying between the Mississippi and the Perdido rivers, and the validity of the grants made by Spain in the disputed territory, after the cession of Louisiana to the United States, were carefully examined and decided in the case of Foster and Elam v. Neilson. This Court, in that case, decided that the question of boundary between the United States and Spain was a question for the political departments of the government; that the legislative and executive branches having decided the question, the courts of the United States are bound to regard the boundary determined by them as the true one; that grants made by the Spanish authorities of lands, which, according to this boundary line belonged to the United States, gave no title to the grantees, in opposition to those claiming under the United States; unless the Spanish grants were protected by the subsequent arrangements made between the two governments; and that no such arrangements were to be found in the treaty of 1819, by which Spain ceded the Floridas to the United States, according to the fair import of its words, and its true construction.

In the case of Foster and Elam v. Neilson, this Court said that the Florida treaty of 1819 declares that all grants made before the 24th January, 1818, by the Spanish authorities, "shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid, if the territories had remained under the dominion of his catholic majesty:" and in deciding the case of Foster v. Elam, the Court held that even if this stipulation applied to lands in the territory in question, yet the words used did not import a present confirmation by virtue of the treaty itself, but that they were words of contract; "that the ratification and confirmation which were promised, must be the act of the legislature; and until such shall be passed, the Court is not at liberty to disregard the existing laws on the subject." Afterwards, in the case of the United States v. Percheman, 7 Peters, 86, in reviewing the words of the eighth article of the treaty, the Court, for the reasons there assigned, came to a different conclusion; and held that the words were words of present confirmation, by the treaty, where the land had been rightfully granted before the cession; and that it did not need the aid of an act of congress to ratify and confirm the grant. This language was, however, applied by the Court, and was intended to apply to grants made in a territory which belonged to Spain at the time of the grant. The case then before the Court was one of that description. It was in relation to a grant of land in Florida, which unquestionably belonged to Spain at the time the grant was made; and where the Spanish authorities had an undoubted right to grant until the treaty

[Garcia v. Lee.]

of cession in 1819. It is of such grants that the Court speak, when they declare them to be confirmed and protected by the true construction of the treaty· and that they do not need the aid of an act of congress to ratify and confirm th itle of the purchaser. The Court do not apply this principle to grants made within the territory of Louisiana. The case of Foster and Elam v. Neilson, must in all other respects be considered as affirmed by the case of Percheman; as it under-went a careful examination in that case, and as none of its principles were questioned, except that referred to.

The leading principle in the case of Foster and Elam v. Neilson, which declares that the boundary line determined on as the true one by the political departments of the government, must be recognised as the true one by the judicial departments; was after that case directly acknowledged and affirmed by this Court, in 1832, in the case of the United States v. Arredondo and others, 8 Peters, 711: and this decision was given by the Court, with the same information before them as to the meaning of the Spanish side of the treaty, which is mentioned in the case of Percheman.

ERROR to the district court of the United States for the eastern district of Louisiana.

In the district court of Louisiana, the plaintiff in error, a resident in Cuba, on the 26th January, 1836, filed a petition, stating that on the 1st of September, 1806, he purchased of the Spanish government, for a valuable consideration, and was put into possession of the same, fifteen thousand arpents of land, divided into three tracts or parcels, having such marks and bounds as are laid down in the original plots and surveys annexed to the deed of sale by Juan Ventura Morales, then intendant of the Spanish government, dated the 5th day of September, 1806. Certified copies of the deed of sale, plots, and surveys were annexed to the petition.

The petition stated that Samuel Lee, a resident in the parish of Feliciana, and a citizen of the state, had taken possession of ten thousand arpents, part of the said grant, which is situated in the now state of Louisiana; and refuses to deliver up the same. The petitioner prays to be put in possession of the said land, &c.

On the 17th day of May, 1836, Samuel Lee filed an answer and exception to the plaintiff's petition, in which he denied " all and singular the allegations in the plaintiff's petition herein exhibited against him, and will, on trial, require strict and legal proof of the same; and especially does he deny any jurisdiction of the Spanish government over the territory in which the land claimed by the plaintiff is situated at the time the grant exhibited by him was made, or at any time subsequent thereto: and strictly denies the right of the said

[Garcia v. Lee.]

government, or the officers thereof to make grants or sales of land therein."

On the 27th of February, 1837, the district court of Louisiana entered a judgment in favour of the defendant; and the plaintiff prosecuted this appeal.

At the hearing of this case in the district court, certain documentary evidence was offered by the plaintiff, which was not received by the court; and the plaintiff took an exception to the rejection of the same. This bill of exceptions, containing all the documents offered and rejected in the court below, was sent up with the record.

The case was argued by Mr. M'Caleb and Mr. Southard, for the plaintiff in error; and by Mr. Jones, for the defendant.

The counsel for the plaintiff in error asked a reversal of the judgment of the district court of Louisiana, on the following grounds:

1st. The grant or sale to the plaintiff was made at a period when the territory between the Mississippi and Perdido was in the actual possession, and under the jurisdiction and sovereignty of the crown of Spain.

2d. Great Britain was the first nation that exercised authority over the said territory in a sovereign capacity; France asserted pretensions to it until the ratification of the treaty of 1763, by which she finally and forever surrendered them to Great Britain: and consequently, the said territory could not have been, and was never intended to be ceded by France to Spain, by a treaty of the same date, to wit, 1763, as part of Louisiana.

3d. The said territory was never called a part of Louisiana by any nation except France; and after the final relinquishment of all her right and title, it was owned and possessed by Great Britain, as part of her West Florida, until the treaty of 1783; when it was ceded by her as such to Spain as a conquered country.

4th. The said territory formed no part of Louisiana, as retroceded by Spain to France by the treaty of St. Ildefonso, of 1800; nor of Louisiana, as ceded by France to the government of the United States by the treaty of Paris, of 1803.

5th. Spain never finally relinquished her right and title to the said territory until the ratification of the treaty of 1819, which was expressly a treaty for the settlement of all the pretensions of the governments of the United States and Spain; and which expressly

VOL. XII.—3 T

confirms all grants made by the Spanish government, prior to the 24th of January, 1818, situated in all the territories to the eastward of the Mississippi, known by the name of East and West Florida.

Mr. Jones, for the defendant, contended that,

The only exception to the decision of the district court is on a point of evidence; namely, the admissibility, as evidence to the jury, of certain papers, seventeen in number.

The only possible tendency of those papers; indeed, the sole and professed object of their introduction, was to expound the meaning, operations, and effect of the treaty concluded at Paris, April 30, 1803, by which France ceded to this country the province of Louisiana.

The particular question which those papers were intended to affect, was one purely of the true construction of the treaty; and that was whether the eastern limit of the ceded territory was bounded by the Mississippi, or extended to the Perdido: a question, in time past, of extensive, animated, and protracted discussion between the governments of Spain and the United States; but practically solved by the latter, who took actual possession of the territory within the disputed limits, as part and parcel of the territory ceded by the treaty; definitively incorporated the whole of it with the territory of the United States, and annexed a part of it to the state of Louisiana: all under the sole authority of that treaty, and with no other title or pretence of title whatever.

We maintain the decision of the district court, ruling out these papers as evidence, upon the following grounds:

1. If this were a question of fact proper to be left to a jury, on extrinsic evidence, the papers in question were not competent evidence of the fact.

2. It is not now, nor was it ever such a question; but was always, so long as it remained open to any sort of controversy, one of construction, completely determinable by the words of the treaty, either taken by itself, or in connection with circumstances of equal notoriety; and equally within the proper sphere of judicial cognizance.

3. Maintaining, as we do, the sufficiency of the reasons upon which the claim to this territory was originally asserted on behalf of the United States, we nevertheless deny that it is, or ever was, a question of judicature; and affirm, that as a question of sovereign right

between the two nations, it came originally, and has ever remained within the peculiar province of such departments of the government as are charged with the management of our foreign relations, and with the highest functions of sovereignty in au erting and maintaining national rights against foreign powers: an as such a question, that it has been long ago conclusively terminated and settled by a series of public acts, in which the executive and legislative powers of the government have concurred to assert and establish the territorial sovereignty and rights of the nation, by the supreme authority of the nation: an authority which no private rights of property, founded in any conflicting rules of municipal law, can oppose; which is supreme over all the people and all the tribunals of the country; and which this Court has judicially recognised and deferred to, as supreme and incontrovertible.

Mr. Chief Justice TANEY delivered the opinion of the Court:

In this case, the appellant claims ten thousand arpents of land, being part of a grant for fifteen thousand arpents; which he alleges, in his petition, were granted to him by the Spanish authorities in 1806. The land is situated in the state of Louisiana, and in the territory lying north of the Iberville, and between the Perdido and the Mississippi; which was so long a subject of controversy between the United States and Spain; and which was finally settled by the cession of the Floridas to the United States, by the treaty of February 22, 1819.

It is well known as a matter of history that the executive and legislative departments of our government have continually insisted that the true boundary of Louisiana as we acquired it by the treaty with France of the 30th of April, 1803, extended to the Perdido; that the claim of the United States was disputed by Spain; and that she refused to deliver the territory, and claimed a right to exercise the powers of government over it: which claim the United States denied. On the 29th of March, 1804, congress passed a law dividing Louisiana into two territorial governments; and in order to protect the interest of the United States in the disputed territory, the 14th section of this law enacts, That all grants for lands within the territories ceded by "the French republic to the United States, by the treaty of the 30th April, 1803, the title whereof was at the date of the treaty of St. Ildefonso in the crown, government or nation of Spain, and every act and proceeding subsequent thereto, of whatso-

[Garcia v. Lee.]

ever nature, towards the obtaining of any grant, title or claim to such lands, and under whatsoever authority transacted or pretended, be, and the same are hereby declared to be, and to have been from the beginning, null and void, and of no effect in law or in equity." The titles of actual settlers, acquired before the 20th of December, 1803, are excepted by a proviso from the operation of this section.

The grant under which the appellant, Garcia, claims, falls within the provisions of this section; and as this law of congress has never been repealed or modified in relation to grants made by the Spanish authorities, the appellant has no title at law or in equity; unless it can be shown that the act of congress in question, upon some ground or other, is void and inoperative; and that the courts of the United States are bound to recognise a title acquired in opposition to its provisions.

The questions presented by the record before us, are not new in this Court. They were examined and considered in the case of Foster and Elam v. Neilson, decided here in 1829; and reported in 2 Peters, 254. In that case, the land in dispute was granted by the Spanish governor on the 2d of January, 1804, and ratified by the king of Spain on the 29th of May, 1804. The controversy in relation to the country lying between the Mississippi and the Perdido; and the validity of the grants made by Spain in the disputed territory after the cession of Louisiana to the United States; were carefully examined and decided in that case: and all of the facts and arguments necessary to a correct decision were then before the Court. They are substantially the same with those now offered to support the claim of the appellant; and are so fully set forth in the report of that case, that it is unnecessary here to repeat them. This Court then decided, that the question of boundary between the United States and Spain, was a question for the political departments of the government; that the legislative and executive branches having decided the question, the courts of the United States were bound to regard the boundary determined on by them as the true one. That grants made by the Spanish authorities of lands, which, according to this boundary line belonged to the United States, gave no title to the grantees, in opposition to those claiming under the United States; unless the Spanish grants were protected by the subsequent arrangements made between the two governments: and that no such arrangements were to be found in the treaty of 1819, by which Spain ceded the Floridas to the United States, according to the fair

import of its words and its true construction. These positions have all been controverted in the argument at the bar, in the case now before us. But we do not think it necessary in deciding the case, to enter upon a discussion of the various topics pressed upon the attention of the Court; and shall content ourselves with extracting several portions of the opinion delivered by Chief Justice Marshall, in the case of Foster and Elam v. Neilson, in order to show that all of the points now raised were carefully considered and decided in the case referred to. In page 309 of 2 vol. of Peters' Reports, the Chief Justice states the opinion of the Court, in the following words:

"After these acts of sovereign power (by the United States) over the territory in dispute, asserting the American construction of the treaty, by which the government claims it; to maintain the opposite construction in its own courts, would certainly be an anomaly in the history and practice of nations. If those departments which are intrusted with the foreign intercourse of the nation, which assert and maintain its interests against foreign powers, have unequivocally asserted its rights of dominion over a country of which it is in possession, and which it claims under a treaty; if the legislature has acted on the construction thus asserted; it is not in its own courts that this construction is to be denied. A question like this, respecting boundaries of nations, is, as has been truly said, more a political than a legal question; and in its discussion, the courts of every country must respect the pronounced will of the legislature. Had this suit been instituted immediately after the passage of the act for extending the bounds of Louisiana, could the Spanish construction of the treaty of St. Ildefonso have been maintained? Could the plaintiff have insisted that the land did not lie in Louisiana, but in West Florida; that the occupation of the country by the United States was wrongful; and that his title under a Spanish grant must prevail: because the acts of congress on the subject were founded on a misconstruction of the treaty? If it be said that this statement does not present the question fairly, because a plaintiff admits the authority of this Court, let the parties be changed. If the Spanish grantee had obtained possession, so as to be the defendant, would a court of the United States maintain his title under a Spanish grant, made subsequent to the acquisition of Louisiana, singly on the principle that the Spanish construction of the treaty of St. Ildefonso was right, and the American construction wrong? Such a decision would, we think,

have subverted those principles which govern the relations between the legislature and judicial departments, and mark the limits of each.

"If the rights of the parties are in any degree changed, that change must be produced by the subsequent arrangements made between the two governments."

After having thus fully expressed the opinion that the Court were bound to recognise the boundary of Louisiana, as insisted on by the legislature of the United States; and that the American grants of land must prevail over those made by the Spanish authorities, after the date of the treaty of St. Ildefonso, unless "the rights of the parties had been changed by subsequent arrangements made between the two governments;" the Court, in the same case, proceed to examine whether the validity of these grants were recognised by the United States, or provided for in the treaty of 1819. And after examining the articles of the treaty, which had been relied on in the argument as providing for the grants made by the Spanish authorities, the opinion of the Court, on that part of the case, is stated by the Chief Justice in the following words: "It is not improbable, that terms were selected which might not compromise the dignity of either government; and which each might understand, consistently with its former pretensions. But if a court of the United States would have been bound under the state of things existing on the signature of the treaty, to consider the territory, then composing a part of the state of Louisiana as rightfully belonging to the United States, it would be difficult to construe this article into an admission that it belonged, rightfully, to his catholic majesty." It had also been contended in argument in that case, that the exception of certain large grants of land by name, (which had been made by the Spanish government,) in the ratification of the treaty by Spain, implied that other fair grants were to be obligatory on the United States. But the Court held otherwise, and say: "The form of this ratification ought not, in their opinion, to change the natural construction of the words of the eighth article, or extend them to embrace grants not otherwise intended to be confirmed by it."

"An extreme solicitude to provide against injury or inconvenience from the known existence of such large grants, by insisting upon a declaration of their absolute nullity, can, in their opinion, furnish no satisfactory proof that the government meant to recognise the small grants as valid; which in every previous act and struggle,

it had proclaimed to be void, as being for lands within the American territory."

Such were the opinions and language of this Court, in the case of Foster and Elam v. Neilson. It is true, that upon another and different point from those abovementioned, an opinion expressed in that case, was afterwards, upon information subsequently obtained, overruled; and in order to prevent misconstruction, it may be proper to state it. It was this. The eighth article of the treaty of 1819, declares that all grants made before the 24th of January, 1818, by the Spanish authorities, "shall be ratified and confirmed to the persons in possession of the lands; to the same extent that the same grants would be valid, if the territories had remained under the dominion of his catholic majesty." And in deciding the case of Foster and Elam v. Neilson, the Court held, that even if this stipulation applied to lands in the territory in question, yet the words used did not import a present confirmation by virtue of the treaty itself; but that they were words of contract between the two nations, and that "the legislature must execute the contract;" "that the ratification and confirmation which are promised, must be the act of the legislature;" and "until such act shall be passed, the Court is not at liberty to disregard the existing laws on the subject." Afterwards, in the case of the United States v. Percheman, 7 Peters, 86, in reviewing these words of the eighth article of the treaty; the Court for the reasons then assigned, came to a different conclusion, and held that the words used, were words of present confirmation by the treaty, where the land had been rightfully granted before the cession; and that it did not need the aid of an act of congress to ratify and confirm the grant. This language was, however, applied by the Court, and intended to apply to grants made in a territory which belonged to Spain at the time of the grant. The case before the Court was one of that description. It was in relation to a grant of land in Florida, which unquestionably belonged to Spain at the time the grant was made; and where the Spanish authorities had an undoubted right to grant, until the treaty of cession in 1819. It is of such grants that the Court speak, when they declare them to be confirmed and protected by the true construction of the treaty; and that they do not need the aid of an act of congress to ratify and confirm the title of the purchaser. But they do not, in any part of the last mentioned case, apply this principle to grants made by Spain within the limits of Louisiana, in the territory which belonged to the United States

according to its true boundary; and where Spain had no right to grant lands after the cession to France by the treaty of St. Ildefonso, in 1800, as herein before mentioned. On the contrary, although the Court, in the case of The United States v. Percheman, refer to the case of Foster and Elam v. Neilson, and carefully explain the reasons which led them to change their opinion as to the true construction of the words "shall be confirmed," in the eighth article of the treaty; yet they use no expression from which it can be inferred that the opinion of the Court had changed in relation to any other principle decided in Foster and Elam v. Neilson. And as that case was then under review, and manifestly, at that time, underwent a careful examination by the Court; and as none of its principles were questioned except the one abovementioned; the case of Foster and Elam v. Neilson must, in all other respects, be considered as affirmed by that of The United States v. Percheman. Indeed, we are not aware of any case in which its authority has been doubted by the Court in any of its principles, with the single exception abovementioned. Expressions may perhaps be found in some opinions delivered here, which, detached from the case under consideration, might create some doubt upon the subject. But these expressions must always be taken with reference to the particular subject matter in the mind of the Court: and when this just rule of construction is applied to the language used, it will be found that there is no case in which the Court ever designed to shake the authority of the case now relied on, or to question the principles there decided; further than is herein before stated. So far from it, the leading principle of the case, which declares that the boundary line determined on as the true one by the political departments of the government, must be recognised as the true one by the judicial department; was subsequently directly acknowledged and affirmed by this Court, in 1832, in the case of The United States v. Arredondo and others, 6 Peters, 711. And this decision was given with the same information before them as to the meaning of the Spanish side of the treaty, which is mentioned in the case of Percheman; and, consequently, that information could not have shaken the confidence of the Court in any of the opinions pronounced in Foster and Elam v. Neilson; further than has been already stated.

In this view of the subject, the case of Foster and Elam v. Neilson, decides this case. It decides that the territory in which this land was situated, belonged to the United States at the time that this

grant was made by the Spanish authority; it decides that this grant is not embraced by the eighth article of the treaty, which ceded the Floridas to the United States; that the stipulations in that article are confined to the territory which belonged to Spain at the time of the cession, according to the American construction of the treaty; and that the exception of the three grants made in the ratification of this treaty, by the king of Spain, cannot enlarge the meaning of the words used in the eighth article; and cannot, in the language of the Court, "extend them to embrace grants not otherwise intended to be confirmed;" or grants "which it (the American government,) had proclaimed to be void, as being for lands wihin the American territory." These principles, thus settled by this Court, cover the whole ground now in controversy.

Indeed, when it is once admitted that the boundary line, according to the American construction of the treaty, is to be treated as the true one in the courts of the United States; it would seem to follow as a necessary consequence, that the grant now before the Court, which was made by the Spanish authorities within the limits of the territory which then belonged to the United States, must be null and void; unless it has been confirmed by the United States by treaty or otherwise. It is obvious that one nation cannot grant away the territory of another: and if a proposition so evident needed confirmation, it will be found in the case of Poole v. Fleeger, 11 Peters, 210. In that case, there had been a disputed boundary between two states; and the parties claimed the same land under grants from different states. The boundary line had been ascertained by compact between the states, after the grants were made. And in deciding between the claimants in that case, this Court said: " In this view of the matter, it is perfectly clear that the grants made by North Carolina and Tennessee, under which the defendant claimed, were not rightfully made, because they were originally beyond her territorial boundary; and that the grant under which the claimants claim was rightfully made, because it was within the territorial boundary of Virginia." And again* " If the states of North Carolina and Tennessee could not rightfully grant the land in question, and the states of Virginia and Kentucky could; the invalidity of the grants of the former arises, not from any violation of the obligation of the grant, but from an intrinsic defect of title in the states."

In the case before us, the grant is invalid from "an intrinsic defect" in the title of Spain. It is true that she still claimed the coun-

try, and refused to deliver it to the United States. But her conduct was, in this respect, in violation of the rights of the United States; and of the obligation of treaties. The United States did not immediately take forcible possession, as they might justly have done; and preferred a more pacific and magnanimous policy towards a weaker adversary. Yet their forbearance could, upon no just grounds, impair their rights or legalize the wrongful grants of Spain, made in a territory which did not belong to her; for the authorities of the United States made known by every means in their power their inflexible determination to assert the rights of this country: and congress, in order to guard against imposition and injustice, declared by law, in 1804, that all grants of land made by the Spanish authorities after the date of the treaty of St. Ildefonso, would be null and void; excepting only those to actual settlers, acquired before December 20, 1803.

The present appellant procured his title from Spain, after the passage of this law. The land granted to him belonged not to Spain, but to the United States; and notice had been given in the most public and authentic manner, that the Spanish grants would confer no title, before the appellant obtained his grant. Upon what ground of law, or equity, then, can the United States be now required to make good this grant? They had done nothing to mislead him, but had taken every measure to warn him and every one else that they would not submit to have the soil which belonged to the United States granted away by a foreign power. If he has been deceived, he has either deceived himself or been misled by the Spanish authorities; and has no right to complain of the conduct of the United States. And if either Spain or the United States intended to provide for these grants in Louisiana, by the treaty ceding the Floridas; it is impossible to believe that words would not have been used which clearly embraced them, and would have left no doubt as to the intention of the parties to the treaty.

If, therefore, this was a new question, and had not already been decided in this Court; we should be prepared now to adopt all of the principles affirmed in Foster & Elam v. Neilson, with the exception of the one since overruled in the case of the United States against Percheman, as hereinbefore stated. The questions, however, are not new ones in relation to these grants. The same principles have been sanctioned by the legislative, executive and judicial departments of the government; and they must be regarded as too

[Garcia v. Lee.]

well settled to be now disturbed: and we think the court below were right in rejecting the testimony stated in the exception, which, if even properly authenticated, could not, upon established principles, have shown title in the appellant under a Spanish grant made in 1806.

The judgment of the district court is therefore affirmed.

Mr. Justice BALDWIN dissented.

This cause came on to be heard on the transcript of the record from the district court of the United States for the eastern district of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said district court in this cause be, and the same is hereby affirmed, with costs.