44 U.S. 212 (1845)
3 How. 212
JOHN POLLARD ET AL., LESSEE, PLAINTIFF IN ERROR,
v.
JOHN HAGAN ET AL., DEFENDANTS IN ERROR.
Supreme Court of United States.

*213 Coxe, for the plaintiff in error.
Sergeant, for the defendant in error.
*219 Mr. Justice McKINLEY delivered the opinion of the court.
This case comes before this court upon a writ of error to the Supreme Court of Alabama.
An action of ejectment was brought by the plaintiffs against the defendants, in the Circuit Court of Mobile county, in said state; and upon the trial, to support their action, "the plaintiffs read in evidence a patent from the United States for the premises in question, and an act of Congress passed the 6th day of July, 1836, confirming to them the premises in the patent mentioned, together with an act of Congress passed the 20th of May, 1824. The premises in question were admitted by the defendants to be comprehended within the patent; and there was likewise an admission by both parties that the land lay between Church street and North Boundary street, in the city of Mobile; and there the plaintiffs rested their case."
*220 "The defendants, to maintain the issue on their part, introduced a witness to prove that the premises in question, between the years 1819 and 1823, were covered by water of the Mobile river at common high tide;" to which evidence the plaintiffs by their counsel objected; but the court overruled the objection, and permitted the evidence to go to the jury. "It was also in proof, on the part of the defendant, that at the date of the Spanish grant to Panton, Leslie & Co., under which they claim, the waters of the Mobile bay, at high tide, flowed over what is now Water street, and over about one-third of the lot west of Water street, conveyed by the Spanish grant to Panton, Leslie & Co.; and that the waters continued to overflow Water street, and the premises sued for, during all the time up to 1822 or 1823; to all which admissions of evidence, on part of the defendants, the plaintiffs excepted." "The court charged the jury, that if they believed the premises sued for were below usual high water-mark, at the time Alabama was admitted into the union, then the act of Congress, and the patent in pursuance thereof, could give the plaintiffs no title, whether the waters had receded by the labour of man only, or by alluvion; to which the plaintiffs excepted. Whereupon a verdict and judgment were rendered in favor of the defendants, and which judgment was afterwards affirmed by the Supreme Court of the state."
This question has been heretofore raised, before this court, in cases from the same state, but they went off upon other points. As now presented, it is the only question necessary to the decision of the case before us, and must, therefore, be decided. And we now enter into its examination with a just sense of its great importance to all the states of the union, and particularly to the new ones. Although this is the first time we have been called upon to draw the line that separates the sovereignty and jurisdiction of the government of the union, and the state governments, over the subject in controversy, many of the principles which enter into and form the elements of the question have been settled by previous, well considered, decisions of this court, to which we shall have occasion to refer in the course of this investigation.
The counsel for the plaintiffs insisted, in argument, that the United States derived title to that part of Alabama, in which the land in controversy lies, from the King of Spain; and that they succeeded to all his rights, powers, and jurisdiction, over the territory ceded, and therefore hold the land and soil, under navigable waters, according to the laws and usages of Spain; and by those laws and usages the rights of a subject to land derived from the crown could not extend beyond high water-mark, on navigable waters, without an express grant; and that all alluvion belonged to the crown, and might be granted by this king, together with all land between high water and the channel of such navigable waters; and by the compact between the United States and Alabama, on *221 her admission into the union, it was agreed, that the people of Alabama for ever disclaimed all right or title to the waste or unappropriated lands lying within the state, and that the same should remain at the sole disposal of the United States; and that all the navigable waters within the state should for ever remain public highways, and free to the citizens of that state and the United States, without any tax, duty, or impost, or toll therefor, imposed by that state. That by these articles of the compact, the land under the navigable waters, and the public domain above high water, were alike reserved to the United States, and alike subject to be sold by them; and to give any other construction to these compacts, would be to yield up to Alabama, and the other new states, all the public lands within their limits.
We think a proper examination of this subject will show, that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to the territory, of which Alabama or any of the new states were formed; except for temporary purposes, and to execute the trusts created by the acts of the Virginia and Georgia legislatures, and the deeds of cession executed by them to the United States, and the trust created by the treaty with the French republic, of the 30th of April, 1803, ceding Louisiana.
All that part of Alabama which lies between the thirty-first and thirty-fifth degree of north latitude, was ceded by the state of Georgia to the United States, by deed bearing date the 24th day of April, 1802, which is substantially, in all its principles and stipulations, like the deed of cession executed by Virginia to the United States, on the 1st day of March, 1784, by which she ceded to the United States the territory north-west of the river Ohio. Both of these deeds of cession stipulated, that all the lands within the territory ceded, and not reserved or appropriated to other purposes, should be considered as a common fund for the use and benefit of all the United States, to be faithfully and bona fide disposed of for that purpose, and for no other use or purpose whatever. And the statute passed by Virginia authorizing her delegates to execute this deed, and which is recited in it, authorizes them, in behalf of the state, by a proper deed to convey to the United States, for the benefit of said states, all the right, title, and claim, as well of soil as jurisdiction, "upon condition that the territory so ceded shall be laid out and formed into states, containing a suitable extent of territory, not less than 100, nor more than 150 miles square, or as near thereto as circumstances will admit: and that the states so formed shall be republican states and admitted members of the federal union, having the same rights of sovereignty, freedom, and independence, as the other states." And the delegates conclude the deed thus: "Now know ye, that we, the said Thomas Jefferson, Samuel Hardy, Arthur Lee, and James Monroe, by virtue of the *222 power and authority committed to us by the act of the said general assembly of Virginia before recited, and in the name and for and on behalf of the said commonwealth, do by these presents convey, transfer, assign, and make over unto the United States in Congress assembled, for the benefit of said states, Virginia inclusive, all right, title, and claim, as well of soil as of jurisdiction, which the said commonwealth hath to the territory or tract of country within the limits of the Virginia charter, situate, lying, and being to the north-west of the river Ohio, to and for the uses and purposes, and on the conditions of the said recited act."
And in the deed of cession by Georgia it is expressly stipulated, "That the territory thus ceded shall form a state and be admitted as such into the union as soon as it shall contain sixty thousand free inhabitants, or at an earlier period if Congress shall think it expedient, on the same conditions and restrictions, with the same privileges, and in the same manner, as is provided in the ordinance of Congress of the 13th day of July, 1787, for the government of the north-western territory of the United States, which ordinance shall in all its parts extend to the territory contained in the present act of cession, that article only excepted which forbids slavery." The manner in which the new states were to be admitted into the union, according to the ordinance of 1787, as expressed therein, is as follows: "And whenever any of the said states shall have sixty thousand free inhabitants therein, such state shall be admitted by its delegates into the Congress of the United States, on an equal footing with the original states in all respects whatever." Thus it appears that the stipulations, trusts, and conditions, are substantially the same in both of these deeds of cession; and the acts of Congress, and of the state legislatures in relation thereto, are founded in the same reasons of policy and interest, with this exception, however  the cession made by Virginia was before the adoption of the Constitution of the United States, and that of Georgia afterwards. Taking the legislative acts of the United States, and the states of Virginia and Georgia, and their deeds of cession to the United States, and giving to each, separately, and to all jointly, a fair interpretation, we must come to the conclusion that it was the intention of the parties to invest the United States with the eminent domain of the country ceded, both national and municipal, for the purposes of temporary government, and to hold it in trust for the performance of the stipulations and conditions expressed in the deeds of cession and the legislative acts connected with them. To a correct understanding of the rights, powers, and duties of the parties to these contracts, it is necessary to enter into a more minute examination of the rights of eminent domain, and the right to the public lands. When the United States accepted the cession of the territory, they took upon themselves the trust to hold the municipal eminent domain for the new states, and to invest them with it, to *223 the same extent, in all respects, that it was held by the states ceding the territories.
The right which belongs to the society, or to the sovereign, of disposing, in case of necessity, and for the public safety, of all the wealth contained in the state, is called the eminent domain. It is evident that this right is, in certain cases, necessary to him who governs, and is, consequently, a part of the empire, or sovereign power. Vat. Law of Nations, section 244. This definition shows, that the eminent domain, although a sovereign power, does not include all sovereign power, and this explains the sense in which it is used in this opinion. The compact made between the United States and the state of Georgia, was sanctioned by the Constitution of the United States; by the 3d section of the 4th article of which it is declared, that "New states may be admitted by the Congress into this union; but no new state shall be formed or erected within the jurisdiction of any other state, nor any state be formed by the junction of two or more states or parts of states, without the consent of the legislatures of the states concerned, as well as of Congress."
When Alabama was admitted into the union, on an equal footing with the original states, she succeeded to all the rights of sovereignty, jurisdiction, and eminent domain which Georgia possessed at the date of the cession, except so far as this right was diminished by the public lands remaining in the possession and under the control of the United States, for the temporary purposes provided for in the deed of cession and the legislative acts connected with it. Nothing remained to the United States, according to the terms of the agreement, but the public lands. And, if an express stipulation had been inserted in the agreement, granting the municipal right of sovereignty and eminent domain to the United States, such stipulation would have been void and inoperative; because the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a state or elsewhere, except in the cases in which it is expressly granted.
By the 16th clause of the 8th section of the 1st article of the Constitution, power is given to Congress "to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may by cession of particular states, and the acceptance of Congress, become the seat of government of the United States, and to exercise like authority over all places purchased, by the consent of the legislature of the state in which the same may be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." Within the District of Columbia, and the other places purchased and used for the purposes above mentioned, the national and municipal powers of government, of every description, are united in the government of the union. And these are the only cases, within the United States, in which all the powers of government are united in a single government, except in the cases already *224 mentioned of the temporary territorial governments, and there a local government exists. The right of Alabama and every other new state to exercise all the powers of government, which belong to and may be exercised by the original states of the union, must be admitted, and remain unquestioned, except so far as they are, temporarily, deprived of control over the public lands.
We will now inquire into the nature and extent of the right of the United States to these lands, and whether that right can in any manner affect or control the decision of the case before us. This right originated in voluntary surrenders, made by several of the old states, of their waste and unappropriated lands, to the United States, under a resolution of the old Congress, of the 6th of September, 1780, recommending such surrender and cession, to aid in paying the public debt, incurred by the war of the Revolution. The object of all the parties to these contracts of cession, was to convert the land into money for the payment of the debt, and to erect new states over the territory thus ceded; and as soon as these purposes could be accomplished, the power of the United States over these lands, as property, was to cease.
Whenever the United States shall have fully executed these trusts, the municipal sovereignty of the new states will be complete, throughout their respective borders, and they, and the original states, will be upon an equal footing, in all respects whatever. We, therefore, think the United States hold the public lands within the new states by force of the deeds of cession, and the statutes connected with them, and not by any municipal sovereignty which it may be supposed they possess, or have reserved by compact with the new states, for that particular purpose. The provision of the Constitution above referred to shows that no such power can be exercised by the United States within a state. Such a power is not only repugnant to the Constitution, but it is inconsistent with the spirit and intention of the deeds of cession. The argument so much relied on by the counsel for the plaintiffs, that the agreement of the people inhabiting the new states, "that they for ever disclaim all right and title to the waste or unappropriated lands lying within the said territory; and that the same shall be and remain at the sole and entire disposition of the United States," cannot operate as a contract between the parties, but is binding as a law. Full power is given to Congress "to make all needful rules and regulations respecting the territory or other property of the United States." This authorized the passage of all laws necessary to secure the rights of the United States to the public lands, and to provide for their sale, and to protect them from taxation.
And all constitutional laws are binding on the people, in the new states and the old ones, whether they consent to be bound by them or not. Every constitutional act of Congress is passed by the will of the people of the United States, expressed through their representatives, *225 on the subject-matter of the enactment; and when so passed it becomes the supreme law of the land, and operates by its own force on the subject-matter, in whatever state or territory it may happen to be. The proposition, therefore, that such a law cannot operate upon the subject-matter of its enactment, without the express consent of the people of the new state where it may happen to be, contains its own refutation, and requires no farther examination. The propositions submitted to the people of the Alabama territory, for their acceptance or rejection, by the act of Congress authorizing them to form a constitution and state government for themselves, so far as they related to the public lands within that territory, amounted to nothing more nor less than rules and regulations respecting the sales and disposition of the public lands. The supposed compact relied on by the counsel for the plaintiffs, conferred no authority, therefore, on Congress to pass the act granting to the plaintiffs the land in controversy.
And this brings us to the examination of the question, whether Alabama is entitled to the shores of the navigable waters, and the soils under them, within her limits. The principal argument relied on against this right, is, that the United States acquired the land in controversy from the King of Spain. Although there was no direct reference to any particular treaty, we presume the treaty of the 22d of February, 1819, signed at Washington, was the one relied on, and shall so consider the argument. It was insisted that the United States had, under the treaty, succeeded to all the rights and powers of the King of Spain; and as by the laws and usages of Spain, the king had the right to grant to a subject the soil under navigable waters, that, therefore, the United States had the right to grant the land in controversy, and thereby the plaintiffs acquired a complete title.
If it were true that the United States acquired the whole of Alabama from Spain, no such consequences would result as those contended for. It cannot be admitted that the King of Spain could, by treaty or otherwise, impart to the United States any of his royal prerogatives; and much less can it be admitted that they have capacity to receive or power to exercise them. Every nation acquiring territory, by treaty or otherwise, must hold it subject to the constitution and laws of its own government, and not according to those of the government ceding it. Vat. Law of Nations, b. 1, c. 19, s. 210, 244, 245, and b. 2, c. 7, s. 80.
The United States have never claimed any part of the territory included in the states of Mississippi or Alabama, under any treaty with Spain, although she claimed at different periods a considerable portion of the territory in both of those states. By the treaty between the United States and Spain, signed at San Lorenzo el Real, on the 27th of October, 1795, "The high contracting parties declare and agree, that the line between the United States and East and West Florida, shall be designated by a line, beginning on the river *226 Mississippi, at the northernmost part of the thirty-first degree of north latitude, which from thence shall be drawn due east to the middle of the Chatahouchee river," &c. This treaty declares and agrees, that the line which was described in the treaty of peace between Great Britain and the United States, as their southern boundary, shall be the line which divides their territory from East and West Florida. The article does not import to be a cession of territory, but the adjustment of a controversy between the two nations. It is understood as an admission that the right was originally in the United States.
Had Spain considered herself as ceding territory, she could not have neglected to stipulate for the property of the inhabitants, a stipulation which every sentiment of justice and of national honour would have demanded, and which the United States would not have refused. But, instead of requiring an article to this effect; she expressly stipulated to withdraw the settlements then within what the treaty admits to be the territory of the United States, and for permission to the settlers to take their property with them. "We think this an unequivocal acknowledgment that the occupation of the territory by Spain was wrongful, and we think the opinion thus clearly indicated was supported by the state of facts. It follows, that Spanish grants made after the treaty of peace can have no intrinsic validity." Henderson v. Poindexter, 12 Wheat. 535.
Previous to the cession made by Georgia, the United States, by the act of Congress of the 7th of April, 1798, had established the Mississippi territory including the territory west of the Chatahouchee river, to the Mississippi river, above the 31st degree of north latitude, and below the Yazous river, subject to the claim of Georgia to any portion of the territory. And the territory thus erected was subjected to the ordinance of the 13th of July, 1787, for its government, that part of it excepted which prohibited slavery: 1 Story's Laws, 494. And by the act of the 1st of March, 1817, having first obtained consent of Georgia to make two states instead of one within the ceded territory, Congress authorized the inhabitants of the western part of the Mississippi territory to form for themselves a constitution and state government, "to consist of all the territory included within the following boundaries, to wit: Beginning on the river Mississippi at the point where the southern boundary line of the state of Tennessee strikes the same; thence east along the said boundary line to the Tennessee river; thence up the same to the mouth of Bear creek; thence by a direct line, to the north-west corner of Washington county; thence due south to the Gulf of Mexico; thence westwardly, including all the islands within six leagues of the shore, to the junction of Pearl river with Lake Borgne; thence up said river to the thirty-first degree of north latitude; thence west along said degree of latitude to the Mississippi river; thence up the same to the beginning." 3 Story's Laws, 1620. *227 And on the 3d of March, 1817, Congress passed an act declaring, "That all that part of the Mississippi territory which lies within the following boundaries, to wit: Beginning at the point where the line of the thirty-first degree of north latitude intersects the Perdido river; thence east to the western boundary line of the state of Georgia; thence along said line to the southern boundary line of the state of Tennessee; thence west, along said boundary line, to the Tennessee river; thence up the same to the mouth of Bear creek; thence by a direct line to the north-west corner of Washington county; thence due south to the Gulf of Mexico; thence eastwardly, including all the islands within six leagues of the shore to the Perdido river; thence up the same to the beginning; shall, for the purposes of temporary government, constitute a separate territory, and be called Alabama.
And by the 2d section of the same act it is enacted, "That all offices which exist, and all laws which may be in force when this act shall go into effect, shall continue to exist and be in force until otherwise provided by law." 3 Story's Laws, 1634, 1635. And by the 2d article of the compact contained in the ordinance of 1787, which was then in force in the Mississippi territory, among other things, it was provided, that "The inhabitants of the said territory shall always be entitled to the benefits of the writ of habeas corpus, and of the trial by jury, and of judicial proceedings according to the course of the common law. And by the proviso to the 5th section of the act of the 2d of March, 1819, authorizing the people of the Alabama territory to form a constitution and state government, it is enacted, "That the constitution, when formed, shall be republican, and not repugnant to the ordinance of the 13th of July, 1787, between the states and the people of the territory north-west of the Ohio river, so far as the same has been extended to the said territory [of Alabama] by the articles of agreement between the United States and the state of Georgia. By these successive acts on part of the United States, the common law has been extended to all the territory within the limits of the state of Alabama, and therefore excluded all other law, Spanish or French.
It was after the date of the treaty of the 22d of February, 1819, between the United States and Spain, but before its ratification, the people of the Alabama territory were authorized to form a constitution; and the state was admitted into the union, according to the boundaries established when the country was erected into a territorial government. But the United States have never admitted, that they derived title from the Spanish government to any portion of the territory included within the limits of Alabama. Whatever claim Spain may have asserted to the territory above the thirty-first degree of north latitude, prior to the treaty of the 27th of October, 1795, was abandoned by that treaty, as has been already shown. We will now inquire whether she had any right to territory below *228 the thirty-first degree of north latitude, after the treaty between France and the United States, signed at Paris on the 30th of April, 1803, by which Louisiana was ceded to the United States. The legislative and executive departments of the government have constantly asserted the right of the United States to this portion of the territory under the 1st article of this treaty; and a series of measures intended to maintain the right have been adopted. Mobile was taken possession of, and erected into a collection district, by act of the 24th of February, 1804, chap. 13, (2 Story's Laws, 914.) In the year 1810, the President issued his proclamation, directing the governor of the Orleans territory to take possession of the country, as far as the Perdido, and hold it for the United States. In April, 1812, Congress passed an act to enlarge the limits of Louisiana. This act includes part of the country claimed by Spain, as West Florida. And in February, 1813, the President was authorized to occupy and hold all that tract of country called West Florida, which lies west of the river Perdido, not then in the possession of the United States. And these measures having been followed by the erection of Mississippi territory into a state, and the erection of Alabama into a territory, and afterwards into a state, in the year 1819, and extending them both over this territory: could it be doubted that these measures were intended as an assertion of the title of the United States to this country?
In the case of Foster and Elam v. Neilson, 2 Peters, 253, the right of the United States to this country underwent a very able and thorough investigation. And Chief Justice Marshall, in delivering the opinion of the court, said: "After these acts of sovereign power over the territory in dispute, asserting the American construction of the treaty, by which the government claims it, to maintain the opposite construction in its own courts would certainly be an anomaly in the history and practice of nations. If those departments, which are intrusted with the foreign intercourse of the nation, which assert and maintain its interests against foreign powers, have unequivocally asserted its rights of dominion over a country of which it is in possession, and which it claims under a treaty; if the legislature has acted on the construction thus asserted, it is not in its own courts that this construction is to be denied." The chief justice then discusses the validity of the grant made by the Spanish government, after the ratification of the treaty between the United States and France, and it is finally rejected on the ground that the country belonged to the United States, and not to Spain, when the grant was made. The same doctrine was maintained by this court in the case of Garcia v. Lee, 12 Peters, 511. These cases establish, beyond controversy, the right of the United States to the whole of this territory, under the treaty with France.
Alabama is, therefore, entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law, *229 to the same extent that Georgia possessed it before she ceded it to the United States. To maintain any other doctrine, is to deny that Alabama has been admitted into the union on an equal footing with the original states, the constitution, laws, and compact, to the contrary notwithstanding. But her rights of sovereignty and jurisdiction are not governed by the common law of England as it prevailed in the colonies before the Revolution, but as modified by our own institutions. In the case of Martin and others v. Waddell, 16 Peters, 410, the present chief justice, in delivering the opinion of the court, said: "When the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters, and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution." Then to Alabama belong the navigable waters, and soils under them, in controversy in this case, subject to the rights surrendered by the Constitution to the United States; and no compact that might be made between her and the United States could diminish or enlarge these rights.
The declaration, therefore, contained in the compact entered into between them when Alabama was admitted into the union, "that all navigable waters within the said state shall for ever remain public highways, free to the citizens of said state, and of the United States, without any tax, duty, impost, or toll therefor, imposed by the said state," would be void if inconsistent with the Constitution of the United States. But is this provision repugnant to the Constitution? By the 8th section of the 1st article of the Constitution, power is granted to Congress "to regulate commerce with foreign nations, and among the several states." If, in the exercise of this power, Congress can impose the same restrictions upon the original states, in relation to their navigable waters, as are imposed, by this article of the compact, on the state of Alabama, then this article is a mere regulation of commerce among the several states, according to the Constitution, and, therefore, as binding on the other states as Alabama.
In the case of Gibbons v. Ogden, 9 Wheat. 196, after examining the preliminary questions respecting the regulation of commerce with foreign nations, and among the states, as connected with the subject-matter there in controversy, Chief Justice Marshall said: "We are now arrived at the inquiry: What is this power?
"It is the power to regulate, that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. These are expressed in plain terms, and do not affect the questions which arise in this case. If, as has been always understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over *230 commerce with foreign nations, and among the several states, is vested in Congress as absolutely as it would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States." As the provision of what is called the compact between the United States and the state of Alabama does not, by the above reasoning, exceed the power thereby conceded to Congress over the original states on the same subject, no power or right was, by the compact, intended to be reserved by the United States, nor to be granted to them by Alabama.
This supposed compact is, therefore, nothing more than a regulation of commerce, to that extent, among the several states, and can have no controlling influence in the decision of the case before us. This right of eminent domain over the shores and the soils under the navigable waters, for all municipal purposes, belongs exclusively to the states within their respective territorial jurisdictions, and they, and they only, have the constitutional power to exercise it. To give to the United States the right to transfer to a citizen the title to the shores and the soils under the navigable waters, would be placing in their hands a weapon which might be wielded greatly to the injury of state sovereignty, and deprive the states of the power to exercise a numerous and important class of police powers. But in the hands of the states this power can never be used so as to affect the exercise of any national right of eminent domain or jurisdiction with which the United States have been invested by the Constitution. For, although the territorial limits of Alabama have extended all her sovereign power into the sea, it is there, as on the shore, but municipal power, subject to the Constitution of the United States, "and the laws which shall be made in pursuance thereof."
By the preceding course of reasoning we have arrived at these general conclusions: First, The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively. Secondly, The new states have the same rights, sovereignty, and jurisdiction over this subject as the original states. Thirdly, The right of the United States to the public lands, and the power of Congress to make all needful rules and regulations for the sale and disposition thereof, conferred no power to grant to the plaintiffs the land in controversy in this case. The judgment of the Supreme Court of the state of Alabama is, therefore, affirmed.
Mr. Justice CATRON dissented.
The statute of 1836, and the patent of the United States founded on it, by which the land in controversy was granted to Wm. Pollard's heirs, have on several occasions heretofore received the sanction of this court as a valid title.
1. In the cause of Pollard's heirs v. Kibbe, 14 Peters, 353, the *231 Supreme Court of Alabama having pronounced an opposing claim under the act of 1824 superior to Pollard's this court reversed the judgment and established the latter, after the most mature consideration.
2. In the case of Pollard v. Files, 2 How. 591, the precise title was again brought before this court, and very maturely considered; it was then said  (page 602)  "This court held, when Pollard's title was before it formerly, that Congress had the power to grant the land to him by the act of 1836: on this point there was no difference of opinion at that time among the judges. The difference to which the Supreme Court of Alabama refers, (in its opinion in the record,) grew out of the construction given by a majority of the court to the act of 1824, by which the vacant lands east of Water street were granted to the city of Mobile."
On this occasion the decision of the Supreme Court of Alabama was again reversed, and Pollard's heirs ordered to be put into possession, and they now maintain it under our two judgments. It is here for the third time.
In the mean time, between 1840 and 1844, a doctrine had sprung up in the courts of Alabama, (previously unheard of in any court of justice in this country, so far as I know,) assuming that all lands temporarily flowed with tide-water were part of the eminent domain and a sovereign right in the old states; and that the new ones when admitted into the union, coming in with equal sovereign rights, took the lands thus flowed by implication as an incident of state sovereignty, and thereby defeated the title of the United States, acquired either by the treaty of 1803, or by the compacts with Virginia or Georgia. Although the assumption was new in the courts, it was not entirely so in the political discussions of the country; there it had been asserted, that the new states coming in, with equal rights appertaining to the old ones, took the high lands as well as the low, by the same implication now successfully asserted here in regard to the low lands; and indeed it is difficult to see where the distinction lies. That the United States acquired in a corporate capacity the right of soil under water, as well as of the high lands, by the treaty with France, cannot be doubted; nor that the right of soil was retained and subject to grant up to the time Alabama was admitted as a state. Louisiana was admitted in 1812; to her the same rules must apply that do to Alabama. All acquainted with the surface of the latter know that many of the most productive lands there, and now in successful cultivation, were in 1812 subject to overflow, and have since been reclaimed by levees.
It is impossible to deal with the question before us understandingly, without reference to the physical geography of the delta of the Mississippi and the country around the gulf of Mexico, where the most valuable lands have been made and are now forming by alluvion deposits of the floating soils brought down by the great rivers; the *232 earlier of which had become dry lands; but the more recent were flowed, when we acquired the country; and are in great part yet so: thus situated they have been purchased from the United States and reclaimed; a process that is now in daily exercise. An assumption that mud-flats and swamps once flowed, but long since reclaimed, had passed to the new states, on the theory of sovereign rights, did, at the first, strike my mind as a startling novelty; nor have I been enabled to relieve myself from the impression, owing to the fact in some degree, it is admitted, that for thirty years neither Congress, or any state legislature, has called in question the power of the United States to grant the flowed lands, more than others: the origin of title, and its continuance, as to either class, being deemed the same. A right so obscure, and which has lain dormant, and even unsuspected, for so many years, and the assertion of which will strip so much city property, and so many estates of all title, should as I think be concluded by long acquiescence, and especially in courts of justice.
Again: the question before us is made to turn by a majority of my brethren exclusively on political jurisdiction; the right of property is a mere incident. In such a case, where there is doubt, and a conflict suggested, the political departments, state and federal, should settle the matter by legislation: by this means private owners could be provided for and confusion avoided; but no state complains, nor has any one ever complained, of the infraction of her political and sovereign rights by the United States, or by their agents, in the execution of the great trust imposed on the latter to dispose of the public domain for the common benefit; on the contrary, we are called on by a mere trespasser in the midst of a city, to assert and maintain this sovereign right for his individual protection, in sanction of the trespass.
But as already stated, the United States may be an owner of property in a state, as well as another state, or a private corporation, or an individual may: That the proprietory interest is large, cannot alter the principle. I admit if the agents of the United States obstruct navigation, the state authorities may remove the obstructions and punish the offenders; so the states have done for many years without inconvenience, or complaint.
Nor can material inconvenience result. If a front to a city, or land for another purpose is needed, Congress can be applied to for a grant as was done by the corporation of Mobile in 1824: If the state where the land lies was the owner the same course would have to be pursued. The states and the United States are not in hostility; the people of the one are also the people of the other; justice and donation is alike due from each.
Connecticut was once a large proprietor in the North-West Territory, (now Ohio.) She owned the shores of a great lake and the banks of navigable rivers: Can it be assumed that the admission of *233 Ohio defeated the title of Connecticut, and that she could not grant? The question will not bear discussion  and how can the case put be distinguished from the one before us: Nay, how can either be distinguished from the rights of private owners of lands above water, or under the water? Yet in either instance, is the owner in fee deprived of his property, on this assumption of sovereign rights.
The front of the city of Mobile is claimed by the act of 1824, sanctioned by this court as a valid grant in the five cases of Pollard v. Kibbe, 14 Peters; of The City of Mobile v. Eslava, 16 Peters, 234; of the same plaintiff v. Hallet, 16 Peters, 261; of the same plaintiff v. Emanuel, 1 How. 95, and of Pollard v. Files, 2 How. 591. Except the grant to Pollard, the act of 1824 confers the entire title, (so far as is known to this court,) of a most valuable portion, and a very large portion, of the second city on the gulf of Mexico, in wealth and population. This act is declared void in the present cause; and the previous decisions of this court are either directly, or in effect, overthrown, and the private owners stripped of all title. On this latter point my brethern and I fully agree: Can Alabama remedy the evil, and confirm the titles by legislation or by patent? I say by patent, because this state, Louisiana, Mississippi, and surely Florida, will of necessity have to adopt some system of giving title if it is possible to do so, aside from private legislation; as the flowed lands are too extensive and valuable for the latter mode of grant in all instances.
The charge of the state court to the jury was, that the act of Congress of 1836, and the patent founded on it, and also, of course, the act of 1824, were void, if the lands granted by them were flowed at high tide when Alabama was admitted; and it was immaterial whether the mud-flat had been filled up and the water excluded by the abour of man or by natural alluvion. And this charge is declared to have been proper, by a majority of this court.
The decision founds itself on the right of navigation, and of police connected with navigation. As a practical truth, the mud-flats and other alluvion lands in the delta of the river Mississippi, and around the Gulf of Mexico, formed of rich deposits, have no connection with navigation, but obstruct it, and must be reclaimed for its furtherance. This is well illustrated by the recent history of Mobile. When the act of 1824 was passed, granting to the corporation the front of the city, it was excluded from the navigable channel of the river by a mud-flat, slightly covered with water at high tide, of perhaps a thousand feet wide. This had to be filled up before the city could prosper, and of course by individual enterprise, as the vacant space, as was apparent, must become city property; and it is now formed into squares and streets, having wharves and warehouses. The squares are built up; and the fact that that part of the city stands on land once subject to the flow of tide, will soon be matter of history. At New Orleans, and at most other places fronting *234 rivers where the tide ebbs and flows, as well as on the ocean and great lakes, navigation is facilitated by similar means; without their employment few city fronts could be formed, at all accommodated to navigation and trade. To this end private ownership is indispensable and universal; and some one must make title. If the United States have no power to do so, who has? I repeat, can Alabama grant the soil? She disavowed all claim and title to and in it, as a condition on which Congress admitted her into the union. By the act of March 2, 1819, (3 Story's Laws, 1726,) the Alabama territory was authorized to call a convention, and form a state constitution; but Congress imposed various restrictions, and among others the following one: "And provided always, that the said convention shall provide by an ordinance, irrevocable without the consent of the United States, that the people inhabiting said territory do agree and declare that they for ever disclaim all right and title to the waste or unappropriated lands lying within the said territory, and that the same shall be and remain at the sole and entire disposition of the United States."
On the 2d of August, 1819, the convention of Alabama formed a constitution, and adopted an ordinance declaring "that this convention, for and on behalf of the people inhabiting this state, do ordain, agree, and declare, that they for ever disclaim all right and title to the waste or unappropriated lands lying within this state; and that the same shall be and remain at the sole and entire disposition of the United States." In addition, all the propositions offered by the act of March 2, 1819, were generally accepted without reservation.
On the 14th of December, 1819, Congress, by resolution, admitted Alabama as a state, on the conditions above set forth. 3 Story's Laws U.S. 1804.
That the lands in contest, and granted by the acts of 1824 and 1836, were of the description of "waste or unappropriated," and subject to the disposition of the United States, when the act of Congress of the 2d of March, 1819, was passed, is not open to controversy, as already stated; nor has it ever been controverted, that whilst the territorial government existed, any restrictions to give private titles were imposed on the federal government; and this in regard to any lands that could be granted. And I had supposed that this right was clearly reserved by the recited compacts, as well as on the general principle that the United States did not part with the right of soil by enabling a state to assume political jurisdiction. That the disclaimer of Alabama, to all right and title in the waste lands, or in the unappropriated lands, lying within the state, excludes her from any interest in the soil, is too manifest for debate, aside from all inference founded on general principles. It follows, if the United States cannot grant these lands, neither can Alabama; and no individual title to them can ever exist. And to this conclusion, as I understand the reasoning of the principal opinion, the doctrine *235 of a majority of my brethren mainly tends. The assumption is, that flowed lands, including mud-flats, extending to navigable waters, are part of such waters, and clothed with a sovereign political right in the state; not as property, but as a sovereign incident to navigation, which belongs to the political jurisdiction; and being part of state sovereignty, the United States could not withhold it from Alabama. On this theory, the grants of the United States are declared void: conceding to the theory all the plenitude it can claim, still Alabama has only political jurisdiction over the thing; and it must be admitted that jurisdiction cannot be the subject of a private grant.
The present question was first brought directly before this court, (as I then supposed, and now do,) in the cause of The City of Mobile v. Eslava, in 1840, when my opinion was expressed on it at some length. It will be found in 16 Peters, 247, and was in answer to the opinion of the Supreme Court of Alabama, sent up as part of the record; having been filed pursuant to the statute of that state, found in Clay's Digest, 286, sec. 6. My opinion, then given, has been carefully examined, and so far as it goes, is deemed correct, (except some errors of the press,) nor will the reasons given be repeated.
In Hallet's case, 16 Peters, 263, reasons were added to the former opinion. And again, in the case of Emanuel, the question is referred to, in an opinion found in 1 How. 101.
In Pollard's Lessee v. Files, 2 How. 602, the question, whether Congress had power to grant the land now in controversy, was treated as settled. As the judgment was exclusively founded on the act of 1836, (the plaintiff having adduced no other title,) it was impossible to reverse the judgment of the Supreme Court of Alabama on any other assumption than that the act of Congress conferred a valid title. I delivered that opinion, and it is due to myself to say, that it was the unanimous judgment of the members of the court then present.
I have expressed these views in addition to those formerly given, because this is deemed the most important controversy ever brought before this court, either as it respects the amount of property involved, or the principles on which the present judgment proceeds  principles, in my judgment, as applicable to the high lands of the United States as to the low lands and shores.